1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JOHN PATRICK HYDE,

        Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:19-cv-00732-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.      INTRODUCTION

On May 24, 2019, Plaintiff John Patrick Hyde ("Plaintiff") filed a complaint under 42 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on September 12, 2019).  He is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Sheila K. Oberto, United States Magistrate Judge.[2]

## II.       BACKGROUND

On July 1, 2014, Plaintiff protectively applied for SSI, alleging disability beginning July 1, 2012, due to diabetes, nerve damage in his shoulder, depression, back injuries, neuropathy of feet and hands, vision problems, and arthritis of his knees.  (Administrative Record ("AR") 120, 192, 440–41, 443, 494, 500, 534.)  Plaintiff was born on October 15, 1967 and was 44 years old on the alleged disability onset date.  (AR 132, 147, 192, 215, 440, 500, 534.)  Plaintiff has high school education and can communicate in English.  (AR 132, 148, 443–44.)

**A.       Relevant Medical Evidence[3]**

**1.       Community Medical Center**

On September 10, 2014, Plaintiff presented to Community Medical Centers Family Medicine to establish primary care.  (AR 702.)  On examination, there was a scar on his left shoulder, and he had difficulty elevating his arm.  (AR 702.)  Plaintiff was prescribed diabetic medications and gabapentin for shoulder and neuropathic pain.  (AR 704.)

On October 17, 2014, Plaintiff treated with Roger Mortimer, M.D. for shoulder pain.  (AR 705.)  Dr. Mortimer prescribed a trial of Vicodin.  (AR 705–06.)  On November 25, 2014, Plaintiff reported "good control" of his chronic left shoulder pain with Norco and tramadol, and that he was able to take part in most of the activities he enjoyed with pain being controlled.  (AR 706, 797.)  His medications were refilled.  (AR 708, 799.)

On January 15, 2015, Plaintiff presented for medication refills and reported "fair control" of his chronic left shoulder pain, and that his pain was 8/10 without medications, 3/10 with medications.  (AR 801.)  Derik Keshishian, M.D., prescribed Plaintiff tramadol, an increased dose of Norco, and gabapentin, and refilled medications for diabetes.  (AR 804.)

On January 23, 2017, Plaintiff presented to Mohsin Jawed, M.D. to re-establish care and to seek medical refills for diabetes mellitus, pancreatic insufficiency, alcoholism, and chronic pain.  (AR 1725.)  Dr. Jawed noted that Plaintiff was followed at the clinic "years ago," that his "insurance

---

[2]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 8.)

[3]  Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

has been changing and he has been moving around." (AR 1725.)  Plaintiff stated he was in an accident in April 2015 and has "bad knees" and his "left shoulder [was] operated on two times." (AR 1725.)  He reported tingling as a result of his peripheral neuropathy. (AR 1725.)  Plaintiff's examination revealed reduced sensation on the soles of the feet, and he was continued on diabetes medications. (AR 1728.) He was noted to still have sufficient pain medication and no refill was given. (AR 1726, 1728.)  Dr. Jawed observed that Plaintiff's "documented history of trauma, although no significant imaging on record, [is the] likely cause of chronic pain." (AR 1728.)

Plaintiff followed up with Dr. Jawed for pain management and referral for an optometrist on January 30, 2017. (AR 1734.)  He reported being in "significant pain" in his lower back, neck, and shoulder. (AR 1735.)  On examination, Plaintiff had tenderness and pain with passive range of motion in the left shoulder. (AR 1735.)  He was also diagnosed with hepatitis C, and referred to a clinic. (AR 1735.)  Dr. Jawed prescribed refills of Norco, and x-rays were ordered to assess Plaintiff's chronic pain.  (AR 1735–36.)  Plaintiff was also prescribed medications for hypertension, which was noted as possibly pain pain-related. (AR 1736.)

On June 8, 2017, Plaintiff presented to Dr. Jawed for medication refills and reported "doing well." (AR 1958.)  He stated that he had recently had "hardware removed from [his] jaw" and was discharged from a skilled nursing facility. (AR 1958.)

Plaintiff suffered a fall during a fishing trip and was admitted to the hospital in September 2017. (AR 2158.)  He complained of neck pain and tingling in his left arm. (AR 2158.)  Plaintiff's gait was noted to be mildly ataxic. (AR 2160.)

   **2.    Clinica Sierra Vista**

On March 31, 2015, Plaintiff presented to Amitasha Mann, M.D. to establish care. (AR 1303.)  He complained of numbness in his left arm and knee pain as a result of working as a tiler. (AR 1303.)  Dr. Mann refilled Plaintiff's diabetes medications and Neurontin but refused to refill his Norco due to an absence of medical records to support it. (AR 1303, 1306.)

On April 18, 2015, Plaintiff treated presented for follow up care and pain management following a recent accident on his motorcycle where he was hit by a car. (AR 806, 1291.)  He complained of broken ribs, scapula, and clavicle. (AR 1291.) Examination by Abraham Mohmand,

3

M.D., revealed abrasions to the left lower back, left leg, and knee, pain in the upper back, and use of a sling for the left shoulder. (AR 1293.)  Dr. Mohmand refilled Norco for pain and recommended that Plaintiff continue use of the sling.  (AR 1294.)

**3.      Family Care Providers Group**

On May 6, 2015, Plaintiff presented for medication refills and complained of joint pain. (AR 1093–94.)  On examination by Isabel Lee, F.N.P., Plaintiff exhibited tenderness in his left shoulder. (AR 1094.)  He was assessed with closed fractures of the ribs, scapula, clavicle, and his vertebral column, along with degenerative arthritis of the knee and chronic pain in his left shoulder. (AR 1095.)  Dr. Lee refilled his diabetes medications and gabapentin.  (AR 1095.)  On June 25, 2015, Plaintiff was referred to orthopedics for his fractured scapula.  (AR 1104.)

Plaintiff was seen by Dr. Lee again on November 9, 2016, complaining of back pain and joint pain. (AR 1482–85.)  She noted that Plaintiff did not follow through with orthopedics for his left shoulder and was on Norco for pain, with his last dose being seven days ago.  (AR 1482.)  On examination, Dr. Lee noted Plaintiff exhibited tenderness in his left shoulder and lumbar spine. (AR 1483.)   He was prescribed Norco for a partial tear of his left subscapularis tendon, osteoarthritis, and tendinitis of his left shoulder, and was given refills of his diabetes medications. (AR 1483.)

On December 12, 2016, Plaintiff presented to Dr. Lee for increased numbness and tingling to his arms and legs. (AR 1479.)  On examination, Dr. Lee noted Plaintiff exhibited tenderness in his left shoulder and lumbar spine.  (AR 1480.)  He was referred to neurology for tingling and numbness in his hands and legs and was discharged from care due to filling his Norco prescription at an authorized pharmacy.  (AR 1480.)

**4.      St. Agnes Medical Center**

On June 15, 2015, Plaintiff received inpatient care for left elbow and shoulder pain.  (AR 1633.)  He complained of stabbing pains to his upper arm, with a loss of range of motion due to swelling and pain with movement.  (AR 1633.)  On examination, Plaintiff was found to have "diffuse erythema" to his left arm with moderate swelling.  (AR 1649.)  An MRI of Plaintiff's left shoulder showed "rotator cuff tendinopathy," "[n]ear full-thickness undersurface tear along the

posterior aspect of the supraspinatus tendon," and a "[c]hronic, nonunited distal left clavicular fracture."  (AR 1648–49.)

On January 2, 2017, Plaintiff was treated in the emergency department following a motor vehicle accident with neck, back, and knee pain and reduced range of motion.  (AR 1580–83.)  A physical examination showed painful range of motion, flexion, and extension, and generalized tenderness in Plaintiff's right knee.  (AR 1581.)  He was diagnosed with cervical strain, lumbar strain, contusion of the right knee, and right knee sprain, and treated with Soma, tramadol, and Tylenol.  (AR 1582.)

**5.    Consultative Examiner Lakshmanaraju Raju, M.D.**

On February 12, 2015, Plaintiff presented to Dr. Raju for an internal medicine evaluation. (AR 787–92.)  He complained of a history of pain in both knees, especially the right knee, such that he cannot walk without the support of a cane.  (AR 787.)  Plaintiff also described a history of insulin-dependent diabetes, and states that he has developed neuropathy on the soles of his feet. (AR 787.)

Dr. Raju noted Plaintiff's straight-leg raising was limited to 30 degrees on the right side due to his right knee.  (AR 790.)  Plaintiff had normal extension in both knees and normal flexion in his left knee, but flexion was limited to 100 degrees in his right knee.  (AR 791.)  With respect to sensation, Dr. Raju noted "indecisive" results, observing that while Plaintiff "seems to have intact tactile pressure sensation over the legs" there was an "absence of tactile joint blunt prick and stereognostic sensations over the feet not conforming to any particular area of the feet or the soles." (AR 791.)  Dr. Raju noted that Plaintiff insisted on walking with a cane as he "feels very unstable on his right knee without the cane."  (AR 792.)  Plaintiff's physical examination was otherwise normal.  (AR 790–92.)

Dr. Raju's diagnostic impressions of Plaintiff were: "[c]hronic degenerative arthritis of the knees more pronounced on the right secondary to his previous floor tiling occupation"; "[c]hronic insulin-dependent diabetes mellitus with peripheral neuropathy of the soles and feet as implied by subjective complaints"; and  "[f]requency of urination no diagnosis established as yet."  (AR 792.)

Dr. Raju assessed Plaintiff's physical residual functional capacity ("RFC")[4] and opined that Plaintiff could stand and walk a maximum of two hours in an eight-hour work day with the use of a cane, which is required for ambulation.  (AR 792.)  Plaintiff could lift and carry a maximum of 10 pounds occasionally and five pounds frequently.  (AR 792.)  Dr. Raju opined that Plaintiff is incapable of performing climbing, balancing, stooping, kneeling, and crouching, and is unable to do workplace environmental activities.  (AR 792.)  No other limitations were found.  (AR 792.)

### 6.  Consultative Examiner Emmanuel Fabella, M.D.

On November 24, 2015, internist Dr. Fabella conducted an internal medicine evaluation.  (AR 1193–98.)  Plaintiff complained of burning pain and numbness in his left shoulder, arm, and hand; neck pain; diabetes; hypertension; and neuropathy in his feet.  (AR 1193–94.)  According to Plaintiff, he is taking Norco and gabapentin to "partially help" treat the pain and numbness in his left shoulder.  (AR 1193.)

Dr. Fabella observed Plaintiff had a normal gait and balance, with no antalgia, and did not require the use of assistive devices for ambulation.  (AR 1195.)  Plaintiff was able to walk on his toes with minimal difficulty.  (AR 1195.)  Examination of Plaintiff's neck showed "no cervical or paracervical tenderness or muscle spasm but range of motion was slightly decreased with both lateral rotation and lateral flexion limited to 45 degrees bilaterally.  (AR 1196.)  Plaintiff had an irregular scar over the left anterior upper chest consistent with his stated history of tumor removal, with decreased range of motion with abduction limited to only 70 degrees in his left shoulder.  (AR 1196.)  Dr. Fabella's examination of Plaintiff's knees showed "mild decrease in range of motion with flexion limited to 90 to 95 degrees associated with mild crepitus, but no effusion."  (AR 1197.)  Dr. Fabella noted Plaintiff expressed pain with flexion, but he "could not rule out symptom exaggeration."  (AR 1197.)  He also noted Plaintiff had "50% hypoesthesia over the fingers of the left hand."  (AR 1197.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Dr. Fabella assessed Plaintiff with "[l]eft brachial neuropathy with mild weakness of the left arm and numbness of the left hand"; "[c]ervicalgia associated with neck movements and prolonged maintenance of neck posture"; and "[b]ilateral knee pain with mild crepitus and decreased range of motion which may be secondary to early osteoarthritis." (AR 1197.)  He opined that, given Plaintiff's impairments, he: could lift 20 pounds occasionally and 10 pounds frequently with the right arm, but less than 10 pounds occasionally and frequently with the left arm, due to his to neuropathy; could walk or stand four hours or less of an eight-hour day due to knee pain; sit for 30 minutes at a time, after which a break is required, due to cervicalgia; climb, balance, kneel, and crawl occasionally, due to left arm numbness and weakness, decreased shoulder abduction, cervicalgia, and bilateral knee pain; could occasionally walk on uneven terrain; should never climb ladders or work at heights, due to left arm numbness and weakness, cervicalgia, and knee pain; and was moderately impaired in gross manipulation involving the left hand due to weakness and was mildly impaired in fine fingering manipulation is due to hypoesthesia. (AR 1197–98.)  Dr. Fabella found no limitations on hearing and seeing or any environmental restrictions.  (AR 1198.)

### 7.    State Agency Physicians

On May 20, 2015, J. Mitchell, M.D., a Disability Determinations Service medical consultant, assessed Plaintiff's RFC and found that he could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for more than six hours in an eight-hour workday; sit for more than six hours in an eight-hour workday; and perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.  (AR 205–09.)  Dr. Mitchell opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds, and frequently crawl, but was otherwise unlimited with respect to postural activities.  (AR 205–09.)  Dr. Mitchell further opined that Plaintiff's front, lateral, and overhead reaching on the left side was limited, and otherwise that he had no other manipulative limitations.  (AR 205–09.)

Upon reconsideration on December 17, 2015, another state agency physician, P. Frye, M.D., reviewed the record and affirmed Dr. Mitchell's findings.  (AR 233–36.)

## B.    Plaintiff's Statements

Plaintiff completed adult function reports on October 30, 2014, (AR 463–71), and August

28, 2015 (AR 512–20). Plaintiff reported that his illnesses and conditions include mental illness, knee difficulties, diabetes, neuropathy, back pain, and esophageal issues. (AR 463, 512.) He lives with friends. (AR 463, 512.) When asked to describe what he does from the time he wakes up to the time he goes to bed, Plaintiff reported that he watches news, uses the internet, has his friend take him places, and rests. (AR 464.)

In his initial function report, Plaintiff reported being able to take care of his personal care and prepare some meals (AR 464–65), but in his later report he stated that he has a "hard time" with his personal care and does not prepare meals due to neuropathy in his hands (AR 513–14). Plaintiff initially reported that he performs light cleaning and laundry (AR 465), but later stated he does no cooking or household chores due to his physical and mental limitations (AR 514–15). He initially reported that he shops for clothes and shoes and attends church and social groups on a regular basis (AR 466–67), but later reported that he mostly stays home and talks to his friends (AR 516). He indicated he is or has taken insulin, Norco, Cephalex, Neurontin, Paxil, gabapentin, pancrealipase, lisinopril, and tramadol to treat his ailments, but suffers side effects such as lethargy, stomach sickness, insomnia, and shakiness. (AR 446, 470, 497, 519, 539, 561, 568.)

## C.    Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on May 21, 2015, and again on reconsideration on April 6, 2016. (AR 243–47, 259–65.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 266–84.) The ALJ conducted an initial hearing on January 19, 2018 but continued the hearing to allow Plaintiff the opportunity to secure representation and to obtain additional medical records. (AR 120, 175–91.). A second hearing was held on May 4, 2018, at which Plaintiff appeared with his counsel and testified as to his alleged disabling conditions. (AR 141–74.)

### 1.    Plaintiff's Testimony

Plaintiff testified that he can walk at a slow pace, cook using the microwave but little else, and is in a lot of pain throughout the day. (AR 154.) He changes positions frequently throughout the day due to pain and has difficulty getting comfortable. (AR 154.) Plaintiff testified he has difficulty doing things with his hands or manipulating small objects, as he can't feel the tips of

his fingers, but he can tie his shoes by placing his feet on a pedestal.  (AR 155–56, 162–63.)  He takes Norco for back and shoulder pain, and he is in constant pain. (AR 158.)   According to Plaintiff, walking aggravates his pain, and he spends a significant amount of time resting.  (AR 159.) He often has sores on his feet.  (AR 160–62.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a production assembler, Dictionary of Operational Titles (DOT) code 706.687-010, which was light work, with a specific vocational preparation (SVP)[5] of 2.  (AR 167–68.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work experience.  (AR 168.)  The VE was also to assume this person could perform a range of light exertional work, with the following limitations: occasional, balancing, stooping, kneeling, crouching, and crawling; no working at unprotected heights or with ladders, ropes, or scaffolding; occasional reaching in all directions with the left (non-dominant) upper extremity; and performance of simple, routine tasks with occasional contact with co-workers, supervisors, and the public.  (AR 168.)  In response to whether such a person could perform Plaintiff's past work or any work in the national economy, the VE testified that there would be no work such a person could perform, as "bilateral frequent upper extremity activity of reaching handling and fingering would be required."  (AR 168.)

The ALJ asked the VE, in a second hypothetical, to consider a person of Plaintiff's age, education, and with his work experience, who could perform a range of light exertional work, with the following limitations: occasional, balancing, stooping, kneeling, crouching, and crawling; no working at unprotected heights or with ladders, ropes, or scaffolding; occasional overhead reaching with the left (non-dominant) upper extremity and frequent reaching in all other directions; frequent handling and fingering with both upper extremities; and performance of simple, routine tasks with occasional contact with co-workers, supervisors, and the public.  (AR 169.)  The VE testified that such a person could perform Plaintiff's past relevant work, and could perform other, light jobs in

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

the national economy, such as cleaner, DOT code 323.687-014 with an SVP of 2; an electronics worker, DOT code 726.687-010 with an SVP of 2; and a cafeteria attendant, DOT code 311.677-010 with an SVP of 2.  (AR 169.)

For a third hypothetical, the ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work experience, who could perform a range of sedentary exertional work, and perform occasional, balancing, stooping, kneeling, crouching, and crawling and frequent handling and fingering bilaterally.  (AR 170.)  The VE testified that such a person could not perform Plaintiff's past work, but could perform the sedentary jobs of semiconductor bonder, DOT code 726.685-066 with an SVP of 2; assembly, DOT code 726.684-110 with an SVP of 2; and an inspector, DOT code 726.684-050 with an SVP of 2.  (AR 170.)

**D.     The ALJ's Decision**

In a decision dated July 3, 2018, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 120–33.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 122–33.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since July 1, 2014, the application date (step one).  (AR 122.)  At step two, the ALJ found Plaintiff's following impairments to be severe: degenerative disc disease of the lumbar, cervical, and thoracic spine; chronic neuropathic pain of the left shoulder, status-post infected granuloma removal; depressive disorder; and alcohol dependence.  (AR 122–23.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 124–25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except he can no more
> than occasionally balance, stoop, kneel, crouch, and crawl.  With the non-dominant

1
2
3

> left upper extremity, he can no more than occasionally reach overhead and
> frequently reaching in all other directions.  He can frequently handle and finger
> with both upper extremities.  He can never work at unprotected heights or with
> ladders, ropes, or scaffolding.  In addition, he is limited to simple, routine tasks
> with no more than occasional contact with coworkers, supervisors, and the public.

4    (AR 126–31.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be

5    expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not

6    entirely consistent with the medical evidence and other evidence in the record."  (AR 126.)

7         The ALJ determined that, given his RFC, Plaintiff was not disabled because he was able to

8    perform his past relevant work of production assembler (step four).  (AR 132.)  The ALJ also made

9    the alternative finding that Plaintiff could perform a significant number of other jobs in the local

10   and national economies, specifically cleaner, electronics worker, and cafeteria assistant (step five).

11   (AR 132–33.)

12        Plaintiff sought review of this decision before the Appeals Council, which denied review

13   on March 20, 2019.  (AR 1–7.)  Therefore, the ALJ's decision became the final decision of the

14   Commissioner.  20 C.F.R. § 416.1481.

15                              **III.    LEGAL STANDARD**

16   **A.    Applicable Law**

17        An individual is considered "disabled" for purposes of disability benefits if he or she is

18   unable "to engage in any substantial gainful activity by reason of any medically determinable

19   physical or mental impairment which can be expected to result in death or which has lasted or can

20   be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

21   However, "[a]n individual shall be determined to be under a disability only if [her] physical or

22   mental impairment or impairments are of such severity that he is not only unable to do his previous

23   work but cannot, considering his age, education, and work experience, engage in any other kind of

24   substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

25        "The Social Security Regulations set out a five-step sequential process for determining

26   whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*,

27   180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.

28   The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

## B.   Scope of Review

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). Additionally, "[t]he court will uphold the

1  ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*;

2  *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible

3  to more than one rational interpretation, the court may not substitute its judgment for that of the

4  Commissioner." (citations omitted)).

5        In reviewing the Commissioner's decision, the Court may not substitute its judgment for

6  that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court

7  must determine whether the Commissioner applied the proper legal standards and whether

8  substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v.*

9  *Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be

10  affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at

11  1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must

12  'consider the record as a whole, weighing both evidence that supports and evidence that detracts

13  from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

14  1993)).

15        Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

16  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

17  454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

18  that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

19  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins*, 466 F.3d at 885).

20  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the

21  agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

22                              **IV.      DISCUSSION**

23        Plaintiff contends that the ALJ erred in rejecting the opinions from the examining and non-

24  examining physicians and instead relied on her own lay interpretation of the medical records to

25  formulate Plaintiff's RFC.  (*See* Doc. 17 at 9–14; Doc. 19 at 2–3.)  Defendant counters that the ALJ

26  properly reviewed the record and resolved the conflicting opinion evidence, resulting in a finding

27  supported by substantial evidence.  (*See* Doc. 18 at 7–10.)

28  ///

**A.      The ALJ Erred in Her Evaluation of the Medical Opinion Evidence**

      **1.      Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)).  "The ALJ must do more than state conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.*  (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"  *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).  The regulations require the ALJ to weigh the contradicted treating physician opinion,

*Edlund*, 253 F.3d at 1157[6], except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

### 2.    Analysis of the ALJ's Treatment of the Opinion Evidence

#### a.    Dr. Raju

Following an examination on February 12, 2015, consultative internist Dr. Raju opined that Plaintiff could stand and walk a maximum of two hours in an eight-hour work day with the use of a cane, which is required for ambulation; could lift and carry a maximum of 10 pounds occasionally and five pounds frequently; is incapable of performing climbing, balancing, stooping, kneeling, and crouching; and is unable to do workplace environmental activities. (AR 792.) Although not specifically identified by the ALJ as a basis for its rejection, Dr. Raju's opinion is contradicted by the opinion of consultative examiner Dr. Fabella, who opined, *inter alia*, that Plaintiff is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently with the right arm, but less than 10 pounds occasionally and frequently with the left arm, and occasionally climbing, balancing, kneeling, crawling. (AR 1197–98.) Thus, the ALJ was required to set forth "specific and legitimate reasons," supported by substantial evidence, for rejecting Dr. Raju's opinion. *Trevizo*, 871 F.3d at 675.

In reviewing the medical evidence and giving "little weight" to the opinion, the ALJ stated that Dr. Raju "based his assessment on a one-time evaluation and did not review any of [Plaintiff's] medical records. In addition, his assessment is inconsistent with [Plaintiff's] treatment record and admitted activities." (AR 131.) These explanations cannot withstand scrutiny.

First, the ALJ's rejection of Dr. Raju's opinion because it was based on a one-time examination of Plaintiff without review of her prior medical records is improper. "Clearly an

---

[6] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

examining physician has no duty to consult and consider a patient's prior records before expressing her opinion regarding the patient's health." *Evans v. Apfel*, No. CV-98-6185-ST, 1999 WL 373788, at *12 (D. Or. May 17, 1999).  The ALJ did not state any reason why Dr. Raju could not have arrived at his opinion after an examination of Plaintiff, and his opinion should not have been summarily dismissed on this basis.  Moreover, if a limited treating relationship constituted a legitimate reason for rejecting an opinion from an examining source, such opinion would *always* be rejected, because the relationship between a claimant and an examining physician is generally limited to a single examination, rendering that opinion worthless.  *See Grayson v. Astrue*, No. 2:11–cv–1656–EFB, 2012 WL 4468406, at *5 (E.D. Cal. Sept. 25, 2012) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (holding that while a limited treating relationship may be a valid reason for not according a treating physician's "findings the conclusive weight of a treating medical-source opinion, . . . it is not by itself a basis for rejecting them—otherwise the opinions of consultative examiners would essentially be worthless . . . .")).

The ALJ's remaining finding that Dr. Raju's assessment is "inconsistent with [Plaintiff's] treatment record and admitted activities" is insufficiently supported.  *See Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988) ("To say that the medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required . . . .").  Although it may be that some of Plaintiff's "treatment record and admitted activities" are inconsistent with the functional limitations found by Dr. Raju, the ALJ does not clearly—or indeed at all—link that evidence to her evaluation of those limitations, and neither the Court, nor the Commissioner post-hoc, may "comb the administrative record" to find support for her finding.[7]  *See Burrell v. Colvin*,

---

[7] However, even when the Court undertakes to examine ALJ's discussion of Plaintiff's "admitted activities," such discussion appears incomplete in favor of a conclusion of non-disability, which is contrary to Ninth Circuit authority. (*See* Section IV.A.2.b, infra.)  For example, while the ALJ is correct that Plaintiff *initially* reported being "able to tend to his personal care, prepare daily meals, and do light household chores" (AR 129), later function reports, as well as Plaintiff's hearing testimony, paint a different picture. (*See* AR 513–14 (Plaintiff has a "hard time" with his personal care and does not prepare meals due to neuropathy in his hands); AR 513–15 (Plaintiff does no cooking or household chores due to his physical and mental limitations); AR 154 (Plaintiff cooks using the microwave but little else due to pain).)  The ALJ additionally observed that a treatment note showed Plaintiff went on a fishing trip in September 2017 (AR 130) but omitted the fact that that same note indicated Plaintiff sustained a fall during that trip and was hospitalized as a result.  (AR 2158.)

775 F.3d 1133, 1138 (9th Cir. 2014); *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts."). In the absence of any linkage by the ALJ of the evidence to her finding, the Court is unable to determine whether the ALJ properly considered that evidence in rejecting Dr. Raju's limitations, and thus that rejection cannot be upheld at this time. *See Garrison*, 759 F.3d at 1012–13 (An ALJ errs by assigning a medical opinion "little weight while doing nothing more than . . . criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.").

### b.   Dr. Fabella

Consultative examining internist Dr. Fabella examined Plaintiff on November 24, 2015, and opined that, given Plaintiff's impairments, he: could lift 20 pounds occasionally and 10 pounds frequently with the right arm, but less than 10 pounds occasionally and frequently with the left arm; could walk or stand four hours or less of an eight-hour day; sit for 30 minutes at a time, after which a break would be required; climb, balance, kneel, and crawl occasionally; could occasionally walk on uneven terrain; should never climb ladders or work at heights; and was moderately impaired in gross manipulation involving the left hand and mildly impaired in fine fingering manipulation. (AR 1197–98.)

The ALJ purportedly gave "some weight" to Dr. Fabella's opinion, finding it "generally consistent with the record," (AR 130), but does not specify what portion of the opinion she was adopting and what portion she was rejecting. It is well-established that an ALJ may not silently reject an examining physician's opinion by simply making contrary findings. *See Garrison*, 759 F.3d at 1012–13. It appears that the ALJ intended to reject Dr. Fabella's opined standing and walking limitation based on Plaintiff's knee pain, as she notes that his physical examination of Plaintiff "showed only a mild decrease in range of motion with flexion limited to 90 to 95 degrees and he noted he could not rule out symptoms exaggeration when the claimant expressed pain with flexion." (AR 130.) While an ALJ may properly discount an examining physician's opinion that is inconsistent with the medical record, including his own findings, *see Valentine*, 574 F.3d at 692–93, the ALJ cannot isolate favorable portions of the record to so. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the [ALJ] to . . . weigh conflicting

evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." (citations omitted)); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (finding that "the ALJ's specific reason for rejecting [a physician's] medical opinion [was] not supported by substantial evidence" because, in part, "the ALJ selectively relied on some entries in [the plaintiff's] records . . . and ignored the many others that indicated continued, severe impairment"); *Reddick*, 157 F.3d at 722–23 (An ALJ may not "cherry pick" from a record to support the conclusion, but rather must account for the context of the whole record.).   Here, the ALJ's finding ignores that, notwithstanding a finding of "mild decrease in range of motion," Dr. Fabella ultimately assessed Plaintiff with "[b]ilateral knee pain with mild crepitus and decreased range of motion which may be secondary to early osteoarthritis."

The ALJ's criticism of Dr. Fabella's opinion because he "noted he could not rule out symptoms exaggeration" (AR 130) is equally unsupported.  While this may constitute substantial evidence to discount **Plaintiff's** credibility, it does not follow that **Dr. Fabella's** opinion can be properly discredited on this basis.  As the above-quoted notation indicates, Dr. Fabella's opinion takes into the account the possibility that Plaintiff was malingering, and there is no evidence that the opinion is based entirely on Plaintiff's (discredited) subjective complaints.

Finally, it appears that the ALJ intended to discredit some portion of Dr. Fabella's opinion because "records show limited complaints and treatment for [Plaintiff's] knee and hand."  (AR 130.)   Other than to point to those "discussed above under Finding #2," the ALJ again impermissibly fails to specify to which records she refers.  *See Embrey*, 849 F.2d at 421–22.  A review of the records cited in support the ALJ's step two finding, however, also appear to be "cherry picked" to support a conclusion and do not account for Plaintiff's entire longitudinal record. *See Reddick*, 157 F.3d at 722–23.  For example, the ALJ's discussion notes that in October 2016 Plaintiff's neurological examination was "non-focal," (AR 123) but ignores that in December 2016 Plaintiff was referred to neurology for tingling and numbness in his hands.  (*See* AR 1480.)  The ALJ also fails to mention that Plaintiff reported tingling as a result of his peripheral neuropathy in January 2017.  (*See* AR 1725.)  The ALJ also misstates the record, noting that Plaintiff reported to Dr. Fabella that his neuropathy symptoms are "mostly controlled" by medication (AR 123), when

1  in fact Plaintiff told Dr. Fabella that his medication only "partially helped" the pain and numbness

2  in his left hand (AR 1193.)

3      With respect to Plaintiff's knee pain, the ALJ's discussion omits records showing Plaintiff

4  was assessed with degenerative arthritis of the knee in May 2015. (*See* AR 1095.)  In addition, the

5  "treatment records" referred to by the ALJ that show Plaintiff's right knee pain was "controlled on

6  opiate therapy" are from 2013. (AR 123, 577.)  The ALJ ignores the medical evidence showing

7  that Plaintiff continued to complain about his knee pain for several years after 2013 (see, e.g., AR

8  1303, 1725) and in 2017 was treated in the emergency department following a motor vehicle

9  accident that injured his right knee.  (AR 1580–83.)  In sum, without any specificity, and with the

10 appearance of improper selectivity, the ALJ's citation to the medical evidence is not a specific and

11 legitimate reason to discount the opinion of Dr. Fabella.

12          **c.     Drs. Mitchell and Frye**

13      Non-examining physicians Drs. Mitchell and Frye opined that Plaintiff could lift and/or

14 carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for more than six hours

15 in an eight-hour workday; sit for more than six hours in an eight-hour workday; and perform

16 unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry

17 restrictions.   (AR 205–09, 233–36.)   According to Drs. Mitchell and Frye, Plaintiff could

18 occasionally climb ladders, ropes, and scaffolds, and frequently crawl, but was otherwise unlimited

19 with respect to postural activities. (AR 205–09, 233–36.) They further opined that Plaintiff's front,

20 lateral, and overhead reaching on the left side was limited, and otherwise that he had no other

21 manipulative limitations.  (AR 205–09.)

22      The ALJ gave "less weight" to the opinions, finding that the more restrictive limitation to

23 work at the light exertional level "is more consistent with [Plaintiff's] treatment history for back

24 pain and his at times poorly controlled diabetes," but rejected the left upper extremity limitation in

25 view of the "absence of significant testing and treatment."  (AR 130.)  The ALJ does not explain

26 what is meant by this latter statement, but the medical record contains objective test results of

27 Plaintiff's left shoulder showing "rotator cuff tendinopathy," "[n]ear full-thickness undersurface

28 tear along the posterior aspect of the supraspinatus tendon," and a "[c]hronic, nonunited distal left

clavicular fracture." (AR 1648–49.) The medical record also contains multiple instances throughout the years of Plaintiff receiving treatment, including referrals to an orthopedist, for his left shoulder pain. (*See* AR 704, 705, 706, 804, 1095, 1104, 1293, 1480, 1482, 1483, 1735.)

### 3. Harmless Error Analysis

In light of the foregoing, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting the medical opinion evidence of Drs. Raju, Fabella, Mitchell, and Frye. Moreover, the Court cannot conclude that the error below was harmless. *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054). If the ALJ were to have accepted any part of the rejected opinions, the ALJ likely would have reached an RFC determination with the greater limitations they recommended. For example, the VE testified that a limitation to occasional reaching with Plaintiff's left arm (as opined by Drs. Mitchell and Frye) would preclude all work. (AR 168.) In addition, a limitation to sedentary work (as opined by Dr. Raju) would have warranted a finding of disability as of Plaintiff's fiftieth birthday under the Medical-Vocational Guidelines, 20 CFR, Part 404, Subpart P, Appendix 2 § 201.12. A substantial likelihood exists that the ALJ's improper rejection of the medical opinion evidence affected the result and therefore was not "inconsequential to the ultimate nondisability determination," so the error was not harmless. *Molina*, 674 F.3d at 1121–22.

## B. The ALJ's Error Warrants Remand for Further Proceedings

Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to remand to the agency for additional investigation or explanation." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations omitted). The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings." *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule"). In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are outstanding issues that must be resolved before a determination of disability can be made;" and (3) "further administrative proceedings would be useful." *Id.* at 1101 (citations omitted). As to the last inquiry, additional "[a]dministrative

proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time." *Id.* (citations omitted).  Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the court's] discretion."  *Swenson*, 876 F.2d at 689 (citation omitted).

Having found that the ALJ failed to articulate specific and legitimate reasons, supported by substantial evidence, for rejecting the medical opinion evidence, the Court finds that the "credit-as-true" exception to the "ordinary remand rule" is inapplicable because additional administrative proceedings will be useful.[8]  In particular, the ALJ's RFC determination conflicted with the opinion evidence, and can be remedied with further proceedings to accord an opportunity to the ALJ to resolve this conflict.  *Cf. Dominguez v. Colvin,* 808 F.3d 403, 408–09 (9th Cir. 2016); *Lule v. Berryhill*, Case No.: 1:15-cv-01631-JLT, 2017 WL 541096, at *6 (E.D. Cal. Feb. 10, 2017) ("When there is conflicting medical evidence, 'it is the ALJ's role to determine credibility and to resolve the conflict.'") (quoting *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  On remand, the ALJ should address this error by properly evaluating the medical evidence and re-assess Plaintiff's functional limitations considering that evaluation and the other medical evidence of record.

The Court will, therefore, remand this matter for further proceedings.

### V.      CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff John Patrick Hyde and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 15, 2020**                          /s/ *Sheila K. Oberto*
                                             UNITED STATES MAGISTRATE JUDGE

[8] Plaintiff concedes that further administrative proceedings are appropriate in this case.  (*See* Doc. 17 at 13; Doc. 19 at 3.)